UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
W. JEAN SIMPSON,                        )
                                        )
        Plaintiff,                      )
                                        )
        v.                              )        Civil Action No. 03-1123 (PLF)
                                        )
MICHAEL O. LEAVITT, Secretary, Dep't of )
        Health and Human Services,      )
                                        )
        Defendant.                      )
_____ )

FINDINGS OF FACT AND CONCLUSIONS OF LAW

        This matter came before the Court for a three day bench trial on plaintiff Jean

Simpson's claim that she was discriminated against by her employer, the Department of Health

and Human Services, in violation of the Age Discrimination in Employment Act ("ADEA"), 29

U.S.C. §§ 621 *et seq.*, when she was not selected for the GS-14 position of Head Start Program

Analyst Officer (Branch Chief) in the Program Management and Operations Branch of the

Program Management Division in the Head Start Bureau in the Fall of 2001.  The Court

previously granted defendant's motion for summary judgment on plaintiff's race discrimination

claim under Title VII of the Civil Rights Act of 1964.  See Simpson v. Leavitt, 437 F. Supp. 2d

95 (D.D.C. 2006).

I. FINDINGS OF FACT

        Upon a careful consideration and evaluation of the testimony of all the witnesses

and the documentary evidence admitted at trial, and making credibility findings as necessary and

appropriate to resolve any material discrepancies in the testimony, the Court makes the following findings of fact.

Head Start is a complex child development program.  The goal of the program is school readiness, ensuring that children from low income families are ready for a successful transition to kindergarten and beyond.  There are approximately 900,000 children enrolled in the Head Start program.  <u>See</u> Trial Transcript ("Tr."), Volume II ("II") at 55-56 (Bovell testim.); Transcript of Douglas Klafehn ("Klafehn Tr.") at 15.[1]  The Head Start Bureau is divided into three divisions: the Program Operations Division, the Program Support Division, and the Program Management Division.  The Program Management Division contains two branches: the Program Management and Operations Branch, and the Training and Technical Assistance Branch.  The program analyst officer position at issue in this case "was, in effect, the branch chief for the Program Management and Operations Branch" of the Program Management Division.  <u>See</u> Klafehn Tr. at 9; Plaintiff's Exhibit ("PX") 2.

Plaintiff Dr. Jean Simpson, who was born on May 15, 1942, is a GS-13 Education Specialist in the Education Services Branch of the Program Support Division of Head Start.  She has held this position from 1993 to the present day.  <u>See</u> PX 2; Tr., Volume I ("I") at 18, 25-26 (Simpson testim.).  Dr. Simpson holds a Bachelor's Degree in Early Childhood Education, a Master's Degree in Human Learning and Development, and a Ph.D. in Human Growth and Development.  The Education Services Branch, in which Dr. Simpson works, manages grants and contracts for services, such as training Head Start directors and the Child Development Associate Credential.  <u>See</u> Tr.II at 59 (Bovell testim.).

---

[1]     Mr. Klafehn's *de bene esse* video deposition was viewed at trial on June 5, 2007.

The Program Management and Operations Branch is responsible for developing and interpreting policies and regulations. The branch also has total responsibility for the tri-annual monitoring reviews of Head Start grantee programs, which includes the creation or revision of the monitoring instrument, training peer reviewers, training consultants, training federal staff nationally, and training team leaders to implement the monitoring. The branch analyzes the data collected from the monitoring reviews to determine how Head Start programs are performing, and prepares an annual report to Congress on program monitoring. See Klafehn Tr. at 19-20; Tr.II at 61, 73 (Bovell testim.). The current monitoring instrument is the Program Review Instrument for Systems Monitoring ("PRISM"), which outlines all of the policies and regulations governing the Head Start program. It contains specific questions addressing Head Start policies and regulations, and the reviewers use the instrument as guidance in conducting their reviews. See Tr.II at 61-62 (Bovell testim.).

Douglas Klafehn, the selecting official, was born on April 9, 1943. For approximately fifteen years, he was the Deputy Associate Commissioner of the Head Start Bureau. See PX 21 at 1; Klafehn Tr. at 10, 17. Dr. Carmen Bovell, the recommending official, was born on April 22, 1945. See Klafehn Tr. at 10; Tr.II at 49 (Bovell testim.); PX 21 at 1. In December 2000, Mr. Klafehn hired Dr. Bovell to be the GS-15 level Director of the Program Management Division. In that position, Dr. Bovell supervised the chief of the Training and Technical Assistance Branch and the chief of the Program Management and Operations Branch. See Tr.II at 50, 52 (Bovell testim.). Prior to joining the Office of Head Start (formerly the Head Start Bureau), Dr. Bovell was a Head Start director for approximately 20 years: in the Prince George's County Public Schools, the Fairfax County Public Schools, and for the Arlington County Community Action Program. See id. at 53-57.

3

From 1996 to 1997, Dr. Bovell was a Head Start Fellow.  See Tr.II at 54 (Bovell

testim.).   "The Fellows are energetic professionals who serve as apprentices in the areas of

program development, research, child development, health, family development, and policy."

See PX 20. Although "all Head Start Fellows are expected to return to their community," there is

no prohibition on the Fellows being hired by the Head Start Bureau instead.  See Tr.II at 54

(Bovell testim.); PX 20; Klafehn Tr. 51-52. Dr. Bovell first met Dr. Simpson in 1996, when Dr.

Bovell came to the Head Start Bureau as a Head Start Fellow.  Dr. Bovell described her

relationship with Dr. Simpson as "cordial."  See Tr.II at 58-60 (Bovell testim.).

In the Fall of 2001, HHS issued Job Opportunity Announcement ACF-01-212

which indicated that applications were being accepted from September 28, 2001 to October 26,

2001 for a Head Start Program Analyst Officer Position GS-343-14.  See PX 10.  The position

was for the Branch Chief of the Program Management and Operations Branch, which

organizationally is located in the Program Management Division.  See Tr.II at 63 (Bovell

testim.); PX 2.  In consultation with Mr. Klafehn, Dr. Bovell revised the Duties and

Responsibilities description and the Ranking Factors of the Job Opportunity Announcement, and

she updated the Introduction and the Major Duties and Responsibilities of the Position

Description.  See Tr.II at 63-65 (Bovell testim.); PX 10; DX 3.

Dr. Bovell testified that she sought an applicant who had the following skill set:

(1) the ability to organize and supervise the work of the Branch; to manage staff, meaning to

direct, supervise, and evaluate Branch staff; (2) the ability to analyze national monitoring data;

(3) the ability to write reports; (4) the ability to provide leadership and guidance to the entire

monitoring process, which includes the training of federal team leaders, developing monitoring

documents, and revising the monitoring instrument; (5) the ability to write and supervise the

4

development of policies and regulations; and (6) the ability to support regional office staff in all

ten regions, as well as the American Indian/Alaskan Native Branch and the Migrant and

Seasonal Program Branch.  See Tr.II at 66 (Bovell testim.); see also PX1; PX 3.

　　　　　　After all of the applications were submitted, Dr. Simpson, along with Amanda

Bryans (the eventual selectee) and Kevin Costigan, were placed on the Selection Certificate; that

is, a list of the three finalists for the position.  See Klafehn Tr. at 31-32; PX 13.  As noted, Dr.

Simpson was born on May 15, 1942.  Ms. Bryans was born on November 7, 1965.  See PX 13.

Mr. Costigan was born on July 19, 1949.  See Defendant's Motion for Summary Judgment at 3.

Dr. Bovell received the three application packages from the Program Support Center.  She

testified that she did not play any role in determining whether the application packages were

complete.  See Tr.II at 67 (Bovell testim.).  Dr. Bovell read each application, looking specifically

at the Knowledge and Abilities that pertained to the Ranking Factors, and the experiences of the

applicants and how they related to the Duties and Responsibilities of the position at issue.  See

id. at 68.

　　　　　　As discussed below, Dr. Bovell ultimately recommended that Ms. Bryans be

selected for the position at issue.  See Tr.II at 77-78 (Bovell testim.).  Douglas Klafehn agreed

with Dr. Bovell's recommendation and selected Ms. Bryans for the position.

　　　　　　Mr. Joe Gulli, who was assigned to personnel matters in the administrative office

of Administration on Children, Youth and Families, informed Dr. Bovell that interviews of the

candidates were not required.  See Tr.II at 65, 68 (Bovell testim.); Tr. Volume III ("III") at 26-27

(Bovell testim.).  Moreover, Dr. Bovell knew Kevin Costigan and Amanda Bryans because they

worked in the Program Management and Operations Branch.  Dr. Bovell, as Ms. Bryans's

second-line supervisor, signed Ms. Bryans's most recent performance appraisal, in which she

5

was rated Outstanding.  Dr. Bovell also knew from her own observations and interactions with

Ms. Bryans that her performance was outstanding.  See id. at 28-29, 39-42.

Mr. Klafehn, the selecting official, knew each of the three applicants personally,

and felt that he was familiar with their qualifications and their ability to perform.  See Klafehn

Tr. at 13-14.  Dr. Bovell and Mr. Klafehn reviewed plaintiff's detailed resume and her most

recent evaluation by her supervisor, Dolly Wolverton.  See id. at 18; PX 11.  In that evaluation,

Dr. Simpson, like Ms. Bryans, was rated Outstanding.  See PX 11; Tr.II at 74, 77 (Bovell

testim.); Tr.III at 15, 39, 68 (Bovell testim.); Klafehn Tr. at 17-18.  Dr. Bovell also spoke to

plaintiff's second-line supervisor, Tom Schultz, the Division Director of the Program Support

Division, about her decision to recommend Ms. Bryans over plaintiff and Mr. Costigan.

According to Dr. Bovell, Mr. Schultz's response caused her "[t]o move ahead in making the

recommendation" of Ms. Bryans.  See Tr.II at 68-70 (Bovell testim.).

Despite rating plaintiff as Outstanding, Ms. Wolverton testified at trial that she

told Dr. Simpson that she did not think that the Branch Chief position at issue in this case "was a

role that [plaintiff] could play and be effective and successful at."  Tr.I at 174 (Wolverton

testim.).  Ms. Wolverton said that the position of Branch Chief would require a lot of

management skill, involved nationwide leadership, overseeing big data collection systems,

monitoring and funding grantees, and overseeing regulations; it was really complex.  See id.

at 171.  Ms. Wolverton testified that she had told Dr. Simpson that this position "probably

wasn't the right job for her and that her skills and knowledge were more closely in line with the

Education Services Branch."  See id. at 170-71.  Moreover, Ms. Wolverton testified that she

always had a problem with Dr. Simpson's writing; she would "always have to critique, and

review, and work with [plaintiff] on" her writing.  See id. at 176.  Ms. Wolverton believed that

as a GS-13, Dr. Simpson "should be able to" do her writing independently.  <u>See id</u>. at 174.  This

testimony is corroborated by the typographical errors on plaintiff's application for the position at

issue.  <u>See</u> PX 11; Tr.I at 89-92 (Simpson testim.).

   In fact, consistent with the testimony elicited from Ms. Wolverton, Dr. Bovell

testified that she noticed the errors in plaintiff's application and thought that plaintiff had not

thoroughly proofread the application.  <u>See</u> Tr.II at 74 (Bovell testim.).  Dr. Simpson admitted

during cross-examination that there are at least four typographical errors in the Knowledge,

Skills and Abilities portion of her application.  <u>See</u> PX 11; Tr.I at 89-92 (Simpson testim.).  Her

resume contains additional grammatical errors.  <u>See</u> PX 11.

   Many aspects of Ms. Bryans's experience had a favorable impact on Dr. Bovell

and ultimately on her decision to recommend Ms. Bryans to Mr. Klafehn.  For example, because

Ms. Bryans had been a Head Start director, Dr. Bovell believed that Ms. Bryans "was thoroughly

knowledgeable of the regulations, policies and requirements governing the Head Start program,

that she was fully aware of the total Head Start program."  <u>See</u> Tr.II at 71 (Bovell testim.).

Moreover, Ms. Bryans "wrote the Head Start transportation regulations and provided extensive

training and technical assistance to regional offices and Head Start grantees in interpreting the

transportation regulations."  <u>See id.</u>; Klafehn Tr. at 16.  This was significant because "the

regulations were new . . . and it was important that the regional offices and the Head Start

grantees have a thorough and complete understanding of the regulations."  <u>See</u> Tr.II at 71

(Bovell testim.).

   In addition, Ms. Bryans was a member of the Head Start Bureau work group on

program monitoring, which participated in developing the PRISM.  <u>See</u> Tr.II at 71-72 (Bovell

testim.).  Ms. Bryans "actually tested the new instrument, the PRISM, and provided information

7

for evaluation of the instrument and any changes, revisions that needed to be made based on the results of the field testing." <u>See</u> <u>id</u>. at 72.  This experience was significant to Dr. Bovell because monitoring "was a major activity of that branch, and it was important that the branch chief be well-versed, knowledgeable, of all aspects of program monitoring including the instrument and the issues in implementation of the instrument . . ." <u>See</u> <u>id</u>.  Lastly, as a Head Start Fellow, Ms. Bryans was a member of the group that developed the training model for the PRISM.  "[T]hey went out region to region and trained the regional staff, the federal team leaders that led reviews, and then . . . designed and participated in the training of peer reviews and consultants, everyone in the national monitoring pool." <u>See</u> <u>id</u>. at 73.  Dr. Bovell was impressed by Ms. Bryans's work "in analyzing national monitoring data and preparing the report to Congress on Head Start monitoring . . ." <u>See</u> <u>id</u>.; Klafehn Tr. at 20-21.

Dr. Simpson herself admitted that Ms. Bryans's experience – which included (1) having to respond to a board of directors, (2) supervising a management team, (3) writing regulations, (4) developing and interpreting policy, (5) creating a monitoring system utilized by Head Start, (6) analyzing national data collected by a Head Start information system, (7) preparing reports to Congress, and (8) being a Head Start director – is valuable for the position of Branch Chief of the Program Management and Operations Branch.  <u>See</u> Tr.I at 95-98 (Simpson testim.).  Plaintiff also admitted that she has never prepared or drafted a report to Congress, or analyzed national data concerning all aspects collected through the PRISM.  <u>See</u> <u>id</u>. at 96-97.

When comparing Ms. Bryans's experience with plaintiff's, Dr. Bovell "did not find in [plaintiff's] application comparable experience." <u>See</u> Tr.II at 74-75 (Bovell testim.).  For example, Dr. Simpson's application lacked information regarding technical report writing,

analyzing national data, and writing and updating regulations.  See id. at 75.  While Dr. Bovell

believed that plaintiff's experience of being a team leader and using the PRISM to monitor Head

Start programs was valuable, "comparing it [to Bryans's], someone who had actually

participated in the development of the instrument, field testing of the instrument, designing and

implementation of the training for implementation of the instrument," Dr. Bovell concluded that

Ms. Bryans's experience deserved "higher weight."  See id.  Similarly, while Dr. Simpson had

extensive experience in managing child care and child development programs, these programs

are not of the "comprehensive and complex nature of Head Start with its various components."

See id.  As a result, Dr. Bovell assigned more weight to Ms. Bryans's application than to

plaintiff's.  In sum, in Dr. Bovell's view, Ms. Bryans's "experiences were more closely matched

to the requirements of the position of branch chief" for the Program Management and Operations

Branch.  See id. at 76.  Dr. Bovell also testified that while she was generally aware of the ages of

Dr. Simpson (59) and Ms. Bryans (36), age played no role whatsoever in her recommendation of

Ms. Bryans for the position at issue in this case.  See id. at 78.  According to Dr. Bovell,

recommending Ms. Bryans over Dr. Simpson "wasn't a close call . . ."  See id. at 77.

   Dr. Bovell recommended Ms. Bryans for the branch chief position in a verbal

conversation with Mr. Klafehn.  See Tr.II at 77-78 (Bovell testim.).  Mr. Klafehn felt it was a

good recommendation and agreed with Dr. Bovell.  See Klafehn Tr. at 21.  Mr. Klafehn and Dr.

Bovell had a "positive impression of the way Ms. Bryans had performed in the four or five years

that she had been working in the Head Start Bureau and her prior experience supported that

performance."  Id.  Mr. Klafehn testified that he and Dr. Bovell felt that Ms. Bryans's "direct

and demonstrated ability, understanding, intelligence and leadership capacity" made her "an

excellent choice for the job."  See id.

While Mr. Klafehn knew that Dr. Simpson had a lot of experience in child development, had served as the project officer on several large grants, and had developed training for Head Start teachers, he stated that "she had not had any particular involvement in issues related to the work of the Program Management and Operations branch . . . in terms of information systems or policy -- or the design and oversight of the monitoring system . . ." Klafehn Tr. at 22.  Although Mr. Klafehn felt that Dr. Simpson "was a good employee in many respects" [he] "didn't think that she was well-suited or had the ability or the experience for the . . . job in question."  See id. at 23.

On November 19, 2001, Mr. Klafehn signed the ACF Merit Promotion Selection Certificate, officially selecting Amanda Bryans for the Head Start Program Analyst Officer, GS-343-14 position.  See PX 13.

At trial, Dr. Simpson offered some evidence that she asserts shows an impermissible preference for younger employees by Head Start.  For example, Dr. Simpson testified that she heard Ann Linehan, a division director, speak at a conference at the Bulger Center in Maryland some time in 2000 or 2001, and that Ms. Linehan made an announcement "that Head Start would be having some vacancies and if anyone knew of younger people or young people who would like to apply for Head Start positions to please refer them and to contact the bureau."  See Tr.I at 70-71 (Simpson testim.).  Plaintiff testified that hearing this made her feel disappointed and frustrated because she felt that the agency wanted "*to bring in younger people* . . ."  See id. at 71 (emphasis added).

Plaintiff called Donald Wyatt as a witness at trial.  Mr. Wyatt testified that at an all-hands Head Start  meeting (year unknown), he heard Ann Linehan, Commissioner Joan Ohl, and Associate Commissioner Wendy Hill state that the "agency was getting older, that so many

10

of the workforce could retire at any particular point, and that we needed *to bring on* younger

people." See Tr.I at 134-138 (Wyatt testim.) (emphasis added).

   Plaintiff also called LaDora Cobb as a witness.  Ms. Cobb testified that at a senior

management meeting (year unknown), she heard Helen Taylor, Associate Commissioner, Ann

Linehan, and Douglas Klafehn "talk about the concern that there were a lot of retirement-eligible

employees and their concern was that . . . they needed to get younger people in the positions."

See Tr.I at 195-97 (Cobb testim.).

   Dr. Bovell also testified that at a staff meeting, she heard Mr. Klafehn talk about

the need "to bring on new staff because of the aging of our staff." See Tr.II at 78 (Bovell

testim.).  Dr. Bovell testified that she understood that to mean "that a significant number of

employees of the office of Head Start or Head Start Bureau would be retiring in the future and

that it made good sense when were hiring opportunities to hire younger staff, younger

individuals." See id. at 80.  Dr. Bovell interpreted "hiring opportunities" to mean "bringing *new*

*employees* from *outside* of the agency *into* the agency." See id. (emphasis added).  Dr. Bovell

testified that age was irrelevant to her recommendation of Ms. Bryans for the selection at issue in

this case.  See id.  Dr. Bovell also testified that Mr. Klafehn's comments at the staff meeting had

no impact on her recommendation of Ms. Bryans because she was looking for the best qualified

candidate.  See id.

   Mr. Klafehn testified that he did not doubt "that there may have been times when

various people spoke about the agency's need to deal with the fact that we have an aging

workforce, many of whom will be retiring soon." See Klafehn Tr. at 71.  He also admitted that

"[t]here's a pressure to hire young people and there's a fact that we need to -- since a very large

percentage of the people are eligible to retire -- that we need to have a workforce . . ." See id.

Mr. Klafehn observed that "[g]overnment, at the sort of macro level, needs to have people come in and become part of . . . the workforce so . . . in that sense, that's just a fact of the American government right now." See id. at 77. Mr. Klafehn explained that "the way that would often get played out would be that . . . we have a lot of vacancies because we have an overall budget -- restraints we're working under. So there are times when there can be choices made about which jobs get filled. I think that one of the ways that younger people end up getting hired is by, among all the jobs that we need filled, is to hire people at lower grades who tend to have less qualifications and less experience, but often end up being younger people. So to the extent when there are *new outside hires*, I think that is a consideration, but it's . . . combined with other factors about which priority there is to fill, which job." See id. at 71-72 (emphasis added); see also id. at 76 ("what I was saying in terms of having opportunities to bring people in at lower grades who might be younger people"); id. at 77 ("the way that gets played out is that where you would have choices about if you're recruiting *new staff* and have a number of positions available . . . that is a consideration in the decisions about what kind of positions are advertised to . . . try to accomplish that.") (emphasis added).

Like Dr. Bovell, see supra at 9, Mr. Klafehn testified that "the age of the applicants played absolutely no role in the selection in question." See Klafehn Tr. at 71; see also id. at 29 (age "didn't enter into our consideration at all"). He observed that "[i]n this case, all of the people that we're talking about are already federal employees, and there was no outside hire." See id. at 72. Even in cases of outside hires, "[w]hen it comes down to each individual action, [he has] never seen [age] as being used as a factor to hire people." See id. at 77-78. Head Start has "hired a lot of people who are not young because they are the best qualified from the outside because they are the best qualified for the job." See id. at 78.

12

II.  CONCLUSIONS OF LAW

This case is governed by the Age Discrimination in Employment Act ("ADEA"),

29 U.S.C. §§ 621 *et seq.*  Under the ADEA, "[a]ll personnel actions affecting employees or

applicants for employment who are at least 40 years of age . . . in executive agencies . . . shall be

made free from any discrimination based on age."  29 U.S.C. § 633a(a); see also Barnette v.

Chertoff, 453 F.3d 513, 515 (D.C. Cir. 2006).  In cases involving allegations of disparate

treatment "liability depends on whether the protected trait (under the ADEA, age) actually

motivated the employer's decision.  That is, the plaintiff's age must have actually played a role

in [the employer's decision making] process and had a determinative influence on the outcome."

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141 (2000) (quoting Hazen Paper Co.

v. Biggins, 507 U.S. 604, 610 (1993)) (internal quotations and citations omitted) (parentheses

and brackets in original); see also Phuong v. National Academy of Sciences, 927 F. Supp. 2d

487, 488-89 (D.D.C. 1996).

In cases where direct evidence of discrimination is lacking, claims of age

discrimination brought under the ADEA are governed by the burden-shifting evidentiary scheme

under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Barnette v. Chertoff, 453

F.3d at 515; Carter v. George Washington Univ., 387 F.3d 872, 878 (D.C. Cir. 2004); Hall v.

Giant Food, Inc., 175 F.3d 1074, 1077 (D.C. Cir. 1999).  Writing for a unanimous panel of the

D.C. Circuit, however, Judge Kavanaugh recently stated: "we emphasize that the question

whether the plaintiff in a disparate-treatment discrimination suit actually made out a prima facie

case is almost always irrelevant when the district court considers an employer's motion for

summary judgment or judgment as a matter of law."  Brady v. Office of the Sergeant at Arms,

520 F.3d 490, 492 (D.C. Cir. 2008) (citing St. Mary's Honor Society v. Hicks, 509 U.S.

502, 514-15 (1993); U.S. Postal Service Board of Governors v. Aikens, 460 U.S. 711, 716

(1983)).[2]  This observation also is true in a case, like this one, that proceeds to a trial before the

Court.  See Brady v. Office of the Sergeant at Arms, 520 F.3d at 494 ("The Aikens principle

applies, moreover, to summary judgment proceedings as well as trial proceedings.").  Indeed, it

is even more compelling at the trial stage.  Judge Kavanaugh "state[d] the rule clearly":

> In a . . . disparate-treatment suit where an employee has suffered
> an adverse employment action and an employer has asserted a
> legitimate, non-discriminatory reason for the decision, the district
> court need not -- *and should not* -- decide whether the plaintiff
> actually made out a prima facie case under *McDonnell Douglas.*
> Rather, in considering an employer's motion for summary
> judgment or judgment as a matter of law in those circumstances,
> the district court must resolve one central question:  Has the
> employee produced sufficient evidence for a reasonable jury to
> find that the employer's asserted non-discriminatory reason was
> not the actual reason and that the employer intentionally
> discriminated against the employee on the basis of race, color,
> religion, sex, or national origin?

Brady v. Office of the Sergeant at Arms, 520 F.3d at 494 (citing St. Mary's Honor Society v.

Hicks, 509 U.S. at 507-08, 511; U.S. Postal Service Board of Governors v. Aikens, 460 U.S.

at 714-16) (emphasis in original).  In this suit, of course, the asserted prohibited consideration

was plaintiff's age.

        In this case, defendant presented credible and persuasive evidence showing that

Dr. Bovell recommended, and Mr. Klafehn selected, Ms. Bryans over Dr. Simpson because, in

their view, Ms. Bryans's experience was more closely matched to the requirements of the

_____

        [2]      While Brady was a Title VII case, the same analysis should apply to cases under
the ADEA.  See Adeyemi v. District of Columbia, – F.3d –, 2008 WL 2065795, * 2-3 (D.C. Cir.
May 16, 2008) (applying Brady analysis to a case under the Americans with Disabilities Act).

position of Branch Chief for the Program Management and Operations Branch.  Specifically,

defendant presented evidence that, as Dr. Bovell and Mr. Klafehn knew, Ms. Bryans had

experience (1) supervising a management team, (2) writing regulations, (3) developing and

interpreting policy, (4) helping to create a monitoring system utilized by Head Start,

(5) analyzing national data collected by a Head Start information system, (6) preparing reports to

Congress, and (7) directing a Head Start program.  While plaintiff had extensive experience in

managing chid care and child development programs, defendant presented evidence showing that

the officials who participated in the selection process did not think that Dr. Simpson's

experience was as comprehensive or relevant as Ms. Bryans's.

　　　Plaintiff has failed to meet her burden proving that she was the victim of

intentional discrimination *vel non*, or that the defendant's proffered reason should not be

believed.  The Court denied defendant's motion for summary judgment on plaintiff's age

discrimination claim because Mr. Klafehn's statements "may support an inference of age-based

discrimination."  <u>Simpson v. Leavitt</u>, 437 F. Supp. 2d at 105-06.  But, at trial, the Court, as the

finder of fact, had an opportunity to assess the credibility of all of the witnesses, and to test

plaintiff's assertions through the crucible of direct and cross examination of those witnesses.

Plaintiff's testimony, and that of her witnesses, failed to show that plaintiff's age "actually

played a role in [the employer's decision making] process and had a determinative influence on

the outcome."  <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. at 141 (brackets in

original).

　　　To support her claim, Dr. Simpson testified about several discrete events that she

believes demonstrates age-based discrimination.  For example, she testified that a desk audit was

performed on her position in 2000, and that the reviewer, Ms. Cheek, told her that she did not get

the promotion because "upper management did not support me in the desk audit."  See Tr.I

at 64-65 (Simpson testim.).  No "upper management" official was specifically identified, and

there is no evidence that either Dr. Bovell or Mr. Klafehn played any role in the desk audit.  Nor

is there any testimony as to why upper management allegedly did not support her.  In fact, Dr.

Bovell could not have participated in the desk audit because she did not join Head Start until

December 2000.  See Tr.II at 50 (Bovell testim.).

   Dr. Simpson also testified that *after* the selection at issue here, she was told by

Ann Linehan, through her supervisor, that she was no longer permitted to perform monitoring

reviews.  See Tr.I at 54 (Simpson testim.).  There is no evidence, however, to suggest that this

had anything to do with Dr. Simpson's age.  In fact, Dr. Simpson testified that "[a]n

announcement went out saying that if you were in the central office you could not do any more

reviews."  See id.  Dr. Simpson provided no evidence regarding the ages of those affected by the

announcement.

   Similarly, Dr. Simpson's witnesses testified about events unrelated to this

selection process, which involved different management officials.  For example, Donald Wyatt

testified that Ms. Bryans became the division director of the Program Operations Division

sometime after the selection at issue in this case.  See Tr.I at 126 (Wyatt testim.).  Dr. Simpson

believes this discredits defendant's case because Ms. Bryans had not worked in one of the

branches under the Program Operations Division prior to becoming the division director, yet Dr.

Bovell and Mr. Klafehn considered Ms. Bryans working in the Program Management and

Operations Branch as a factor in selecting her to become chief of that branch.  But, as the Court

noted at trial, "[i]t's different selecting officials, different recommending officials, different

years.  It's after the fact.  There are different criteria for the jobs.  It's got nothing to do with [the selection at issue]."  Tr.I at 132.

Lastly, LaDora Cobb testified that in 1999, Rita Schwartz, who was the Branch Chief of the Program Management and Operations Branch prior to Ms. Bryans's selection, re-assigned the writing of the transportation regulations from Ms. Cobb to Ms. Bryans.  See Tr.I at 193-94 (Cobb testim.).  Ms. Cobb explained that Ms. Schwartz "wanted to give Amanda Bryans the exposure to working on a transportation reg, which was a substantive piece of work because it was going to affect all of the Head Start programs nationally."  See id. at 194.  Dr. Simpson wants the Court to infer age discrimination because Ms. Cobb was 51 years old at the time of the work reassignment and Ms. Bryans was 34 years old.  But, just as the Court noted above, this event involved a different year, a different official, and presumably different criteria. It therefore is irrelevant to the selection at issue in this case.

Dr. Bovell and Mr. Klafehn both testified that they thought that Ms. Bryans's experience was more relevant to the position at issue.  Ms. Bryans's experience as a Head Start director meant that she was fully versed in the "regulations, policies and requirements governing the Head Start program."  Tr.II at 71 (Bovell testim.).  Furthermore, Ms. Bryans had experience drafting regulations, and had an extensive knowledge of the PRISM.  See id. at 71-72.  This was significant to Dr. Bovell because monitoring is a major activity of the branch, and the branch chief must be "well-versed, knowledgeable, of all aspects of the program monitoring."  See id. Dr. Bovell also thought this experience more relevant, and worth a "higher weight" than plaintiff's, because it better corresponded with the abilities that the Branch Chief would need. See id. at 75; see also Barnette v. Chertoff, 453 F.3d at 517 ("courts must defer to the employer's decision as to which qualities required by the job (substantive versus managerial) it weighs more

17

heavily") (citation omitted).  Mr. Klafehn also testified that he had observed Ms. Bryans's past

performance and thought highly of it.  See Klafehn Tr. at 21.

In contrast, Mr. Klafehn testified that he did not believe Dr. Simpson was a good

fit for the position, despite her experience, because she lacked "involvement in issues related to

the work of the Program Management and Operations Branch."  See Klafehn Tr. at 22.  His

assessment was corroborated by plaintiff's former supervisor, Dolly Wolverton.  Ms. Wolverton

did not think that plaintiff would be successful or effective in the role of branch chief, which

required "a lot of management skill" and involved "really complex" and "nationwide"

responsibilities.  See Tr.I at 171 (Wolverton testim.).  Ms. Wolverton also testified about the

weakness of plaintiff's writing skills.  See id. at 174-76.  Although Dr. Simpson gained

experience with the monitoring system in her current position in the Program Support Division,

see Tr.I at 25, 97 (Simpson testim.), this experience was not as comprehensive as Ms. Bryans's

because it did not include the design or implementation of the system as a whole.  Moreover,

while Dr. Simpson has experience managing childcare programs, the experience was not as

complex as directing an entire Head Start program.  See Tr.II at 75 (Bovell testim.).

In short, Dr. Bovell and Mr. Klafehn each concluded that Ms. Bryans's

experience was superior to plaintiff's in the context of this selection, and they each expressed

specific, legitimate reasons for their conclusions.  Mr. Klafehn and Dr. Bovell sought the person

they thought was most likely to succeed as the Branch Chief of the Program Management and

Operations Branch, and selected accordingly.  Such decisions, based upon qualifications alone,

are not to be second-guessed by the courts.  See Stewart v. Ashcroft, 352 F.3d 422, 430 (D.C.

Cir. 2003).  Although a court may infer discrimination where a plaintiff who was denied a

promotion was *significantly* more qualified than the applicant who received the promotion, the

D.C. Circuit has held that the qualifications gap must be "wide and inexplicable."  Holcomb v. Powell, 433 F.3d 889, 897 (D.C. Cir. 2006) (quoting Lathram v. Snow, 336 F.3d 1085 (D.C. Cir. 2003)).  In this case, plaintiff cannot rest on a comparison of qualifications.  A reasonable factfinder, even one "who might disagree with the employer's decision, but would find the question close, would not usually infer discrimination on the basis of a comparison of qualifications alone."  Aka v. Washington Hospital Center, 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc).  The evidence in this case does not demonstrate that Dr. Simpson was significantly more qualified for this position than Ms. Bryans.  In fact, it shows that Ms. Bryans had the more relevant experience.  Moreover, Dr. Simpson's application has numerous typographical errors.  See PX11.  Dr. Simpson herself admitted that Ms. Bryans's experience was highly relevant to the Branch Chief position.  See Tr.I at 95-98.  Thus, based upon plaintiff's own assessment of Ms. Bryans's qualifications, the Court cannot infer that Ms. Bryans's selection was a result of age discrimination.

Dr. Simpson also attempts to establish discrimination through various statements by Head Start managers regarding the agency's legitimate need to attract a young workforce, because of the large number of employees eligible for retirement.  Dr. Simpson failed to show, however, that the statements had anything to do with the job selection at issue in this case.  First, the statements refer to attracting younger people to apply from *outside* of the agency.  None of the statements refer to promotional decisions, because the managerial concern was about attracting *new* hires.  Furthermore, Dr. Simpson has not demonstrated that the statements reflect an agency practice of making age a determinative factor in hiring or in promotional decisions.  Encouraging young people to apply does not mean that their qualifications are irrelevant, or that the agency will overlook older, more qualified persons in an actual selection, or – most

importantly – that the agency did so when it promoted Ms. Bryans and not Dr. Simpson during the selection process at issue here.

Indeed, Mr. Klafehn explained that budget constraints often dictate that lower graded jobs be filled, so that the agency hires "people at lower grades who tend to have less qualifications and less experience, but often end up being younger people." Klafehn Tr. at 71-72. As Judge Bates has noted, it is not necessarily discriminatory to hire at lower grades that attract younger people, especially in the face of budget constraints. See Silver v. Leavitt, Civil Action No. 05-0968, 2006 WL 626928, at *14 (D.D.C. March 13, 2006) (the choice to hire at lower grades does not amount to age discrimination despite the strong correlation of age to those positions). Dr. Simpson has failed to show that managerial concerns about an aging workforce, which is the evidence from which plaintiff asks the Court to draw discriminatory inferences, were addressed through high-ranking, promotional decisions such as the one at issue in this case, and not through the offering of lower-grade jobs to outside applicants, as defendant offered evidence to show. Even with the acknowledged concern regarding an aging workforce, Mr. Klafehn credibly testified that the agency has "hired a lot of people who are not young . . . from the outside because they are the best qualified for the job." Klafehn Tr. at 78.

In sum, plaintiff failed to present sufficient evidence at trial to convince the Court, as finder of fact, by a preponderance of the evidence that age actually "played a role in [the employer's decision making] process and had a determinative influence on the outcome." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 141 (internal citations omitted). As Judge Huvelle has noted, it "is not this Court's job to decide if defendant's proffered reasons were wise, fair, or correct, but rather, whether defendant honestly believed those reasons and acted in good faith upon those beliefs." Crockett v. Richardson, 127 F. Supp. 2d 40, 47 (D.D.C.

20

2001).  Defendant presented credible evidence that showed that Ms. Bryans was selected instead of Dr. Simpson because both Dr. Bovell and Mr. Klafehn agreed that Ms. Bryans was the most qualified among the qualified applicants.  Accordingly, the Court will enter judgment for defendant.

    An appropriate Order will be issued this same day.


            _____/s/_____
            PAUL L. FRIEDMAN
            United States District Judge

DATE:  June 3, 2008